IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-01377-PAB-NRN

TEGU, a California corporation,

    Plaintiff,

v.

VESTAL DESIGN ATELIER LLC, a Colorado limited liability company, whose members are Michael Lin, a California resident, David Pitman, a Colorado or California resident, and Jeffrey Warren, a Massachusetts resident,

    Defendant and Counterclaim Plaintiff,

v.

TEGU, a California corporation, and
CLIPPER INVESTMENTS, LTD., an entity based in London, UK,

    Counterclaim Defendants.

---

# ORDER

---

This matter comes before the Court on Tegu's Rule 12(c) and 12(b)(1) Motion for Judgment on the Pleadings and to Dismiss Vestal's Counterclaims [Docket No. 23]. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1338(a) and 1367.

## I. BACKGROUND

The allegations in the Second Amended Answer, Second Amended Counterclaim Complaint, and Jury Demand [Docket No. 26] are to be taken as true in considering a motion for judgment on the pleadings. *Adams v. Jones,* 577 F. App'x 778, 781-82 (10th Cir. 2014) (unpublished).

Plaintiff and counterclaim defendant Tegu ("Tegu") is a toy company. Docket No. 26 at 10, ¶ 2. In late 2007, Tegu sought the help of defendant and counterclaim plaintiff Vestal Design Atelier LLC ("Vestal") in developing its first toy line. *Id*. at 11, ¶ 4. Vestal is a consulting firm specializing in design projects for early-stage startup companies. *Id*. at 10, ¶ 1. In December 2007, Tegu and Vestal entered into a written consulting agreement (the "agreement"). *Id*. at 12, ¶ 7. The agreement provided that Vestal would provide design and consulting services for Tegu's new product line. Under a section called "Compensation," Tegu agreed to pay Vestal $7,200 for 90 hours of work. Docket No. 23-2 at 3. Paragraph 1 of Section 2.0 in the agreement, entitled "Ownership of Intellectual Property," states in full:

> Ownership. Intellectual property rights of each party will be governed by the following: For the purpose of this contract, any work product or new invention related to or arising from the Services provided hereunder, including all intellectual property rights created, invented or authored by Contractor in connection with the Services, will be the exclusive property of the Client. The Client will own all right, title and interest in such work product or new invention, except as stipulated in [ ] item 4 below. Contractor hereby assigns all such right, title and ownership to Client.

*Id*. at 4.

"Item 4" is paragraph 4, which states in full:

> For any work product, invention and/or intellectual property generated under this Agreement that [Vestal] and [Tegu] mutually agree may be patented under a utility (non-aesthetic) patent, [Vestal] shall own at least 50% of any utility patent generated from [Vestal]'s research and design. In addition, [Vestal] will be granted by [Tegu] a fair and agreeable share in revenue generated by commercialization. A separate agreement shall be established in writing, which specifies the precise nature of [Vestal]'s and [Tegu]'s ownership of Intellectual Property rights and share in revenue generated from the commercialization of the invention or Intellectual Property at a time no later than the filing date of the patent application (provisional or full application).

2

*Id*.

Pursuant to the agreement, Vestal created prototypes for Tegu of a new toy based around the idea of embedding magnets in wooden blocks. Docket No. 26 at 13-14, ¶¶ 12-14. The prototype led Tegu to develop an entire line of magnet-embedded wooden blocks. *Id*. at 14, ¶ 15. The wooden blocks encompassed both patentable and non-patentable contributions made by Vestal. *Id*., ¶ 16. On March 14, 2009, Christopher Harwood Haughey ("Haughey"), one of the owners of Tegu, emailed Vestal's members to "resolve the outstanding IP and upside issue left hanging by [the agreement]" in light of Tegu's plan to commercialize the wooden blocks. *Id*. at 15, ¶ 18. In the email, Haughey stated that Tegu anticipated "that any utility patent(s) related to the magnetic blocks [would] relate to the method of manufacturing, which has . . . no relation to the project with Vestal." *Id*., ¶ 20. On March 26, 2009, Tegu filed a patent application that incorporated Vestal's contributions to the wooden block project. *Id*. at 16, ¶ 21. On October 7, 2014, the U.S. Patent and Trademark Office issued U.S. Patent No. 8,850,683 (the "'683 patent") to Tegu. *Id*., ¶ 21. Tegu and its investor, counterclaim defendant Clipper Investments, Ltd. ("Clipper"), subsequently obtained two more patents based on the '683 patent: U.S. Patent Nos. 9,266,032 (the "'032 patent") and 9,662,592 (the "'592 patent"). *Id*, ¶ 22. In 2017, Vestal principal Michael Lin ("Lin") became aware of the magnetic wooden blocks and learned that they had been patented and commercialized. *Id*. at 16-17, ¶ 23.

On May 10, 2018, Tegu filed a declaratory judgment action in the District Court for Adams County, Colorado, against Vestal. Docket No. 1-1. Vestal removed the case

to this Court.  Docket No. 1.  Tegu seeks a declaratory judgment that the three-year statute of limitations for breach of contract claims under Colorado law bars Vestal's claims arising under the agreement.  Docket No. 1-1 at 8, ¶ 41.  Vestal counterclaimed, asserting six correction of inventorship claims pursuant to 35 U.S.C. § 256, alleging that Tegu failed to name Lin and Alexander Ko ("Ko") as inventors of the '683 patent, '032 patent, and '592 patent.  Docket No. 26 at 17-20, ¶¶ 28-45.  Vestal also asserts state-law claims for breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, and fraud.  *Id*. at 20-25, ¶¶ 46-73.

Tegu moves for judgment on the pleadings on its request for declaratory judgment and Vestal's state-law counterclaims pursuant to Fed. R. Civ. P. 12(c).  Docket No. 23 at 7-13.  Tegu also moves for dismissal of Vestal's correction of inventorship claims pursuant to Fed. R. Civ. P. 12(b)(1), asserting that Vestal lacks standing to bring such claims.  *Id*. at 13-15.

## II. LEGAL STANDARD

### A. Fed. R. Civ. P. 12(b)(1)

A motion under Fed. R. Civ. P. 12(b)(1) is a request for the Court to dismiss a claim for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A plaintiff bears the burden of establishing that the Court has jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  When the Court lacks subject matter jurisdiction over a claim for relief, dismissal is proper under Rule 12(b)(1).  *See Jackson v. City and Cty. of Denver*, No. 11-cv-02293-PAB-KLM, 2012 WL 4355556 at *1 (D. Colo. Sept. 24, 2012).

4

Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). The court may review materials outside the pleadings without converting the Rule 12(b)(1) motion to dismiss into a motion for summary judgment. *Davis ex rel. Davis v. U.S.*, 343 F.3d 1282, 1296 (10th Cir. 2003).

### B.  Fed. R. Civ. P. 12(c)

The Court reviews a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) much as it does a motion to dismiss pursuant to Rule 12(b)(6). *See Adams,* 577 F. App'x at 781-82 ("We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion.") (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006)). The Court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Id*. at 782. To prevail, the moving party must show that "no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000). A party may raise arguments that could be made in a motion under Rule 12(b)(6) in a motion under Rule 12(c). Fed. R. Civ. P. 12(h)(2).

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted ).

### III. ANALYSIS

#### A. Vestal's Claims

The Court turns first to Vestal's claims, all of which are challenged by Tegu. Tegu moves for judgment on the pleadings on Vestal's state-law claims, asserting that they fail to state a claim upon which relief can be granted. Docket No. 23 at 9-13.

6

Tegu also moves to dismiss Vestal's correction of inventorship claims, asserting that Vestal lacks standing to assert the claims. *Id*. at 13-15.

### *1. Whether Section 2.4 is Enforceable*

The interpretation of a contract is a question of law. *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013).[1] A reviewing court's "primary aim in contract interpretation is to ascertain and implement the intent of the parties." *Id*. To determine the intent of the parties, "the court should give effect to the plain and generally accepted meaning of the contractual language." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

Under Section 2.1 of the contract, Tegu owns any work product or invention, including all intellectual property, "created, invented or authored" by Vestal in connection with the contract, except as "stipulated" in Section 2.4. Docket No. 23-2 at 4. Section 2.4 states that any work product or invention, including intellectual property, that Tegu and Vestal "mutually agree" may be patented under a utility patent "shall" be owned at least fifty percent by Vestal if it is "generated from [Vestal's] research and design." *Id*. Additionally, Tegu "shall" grant Vestal "a fair and agreeable share in revenue generated by commercialization." *Id*. Finally, the parties "shall" establish a separate written agreement, no later than the filing date of the patent application, specifying the precise nature of each party's ownership of the intellectual property rights

---

[1] Colorado law governs the contract through a choice-of-law clause. *See* Docket No. 23-2 at 9, ¶ 9.

and share of revenue generated by commercialization. *Id*.

Tegu argues that Section 2.4 is unenforceable because it does not indicate a "meeting of the minds on key terms and an intent to be bound" and is therefore an "agreement to agree." Docket No. 23 at 9. "[T]here can be no binding contract if it appears that further negotiations are required to work out important and essential terms." *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001). Consequently, "[a]greements to agree in the future are generally unenforceable because the court cannot force the parties to come to an agreement." *Id*. (citing *Griffin v. Griffin*, 699 P.2d 407 (Colo. 1985)). However, where "the terms of a contract . . . provide a basis for determining the existence of a breach and for giving an appropriate remedy," the terms are "reasonably certain" and may be enforced. Restatement (Second) of Contracts, § 33(2) (1981); *see also Am. Min. Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 808 (Colo. 1951).

Tegu argues that the requirement that it "mutually agree" with Vestal regarding what work product may be patented renders Section 2.4 unenforceable. *See* Docket No. 23. The first sentence of Section 2.4 states that "[f]or any . . . intellectual property generated under this Agreement that [Vestal] and [Tegu] mutually agree may be patented . . . [Vestal] shall own at least 50% of any utility patent generated from [Vestal's] research and design." *See* Docket No. 23-2 at 4. It is clear from this language that agreement is required. This language does not predicate Vestal's ownership simply on the generation of intellectual property. For example, the sentence does not say that, "for any intellectual property generated, Vestal shall own at least fifty

8

percent generated by Vestal's research and development." Rather, the parties emphasized that they needed to "mutually agree." The parties could have adopted a different approach and decided to forego mutual agreement on the patentability of intellectual property. They could have, for instance, used a retrospective approach whereby Vestal had a right to at least fifty percent of any patent that Tegu actually obtained based on Vestal's research and development. However, the parties instead opted for a prospective approach, wherein the parties were required to determine Vestal's ownership and revenue share "at a time no later than the filing date of the patent application." Such obligations were triggered by mutual agreement that certain intellectual property was patentable. Thus, the cooperation between Vestal and Tegu before the patent was filed was necessarily preceded by the parties' agreement as to patentability.

Moreover, even if the Court could infer from the mandatory language used in Section 2.4 ("shall own," "will be granted," and "shall be established") an enforceable duty on Tegu's part to grant Vestal a share ownership and revenue, neither Section 2.4 nor any other part of the agreement provides a discernable standard for doing so. *See* Docket No. 23-2 at 4. Notably, the agreement does not contain a section on remedies in the event Section 2.4 is breached. Although Section 2.4 states that Tegu will grant Vestal a "fair and agreeable share" of revenue, such language provides no guidance as to what would be a "fair" share of revenue under various ownership percentages or how a court would determine whether this fair revenue share would also be "agreeable" to the parties. Even if a court could determine a fair revenue share, the court would still be faced with the lack of any standard for determining the ownership percentage. The

9

Court concludes that Section 2.4 does not indicate that the parties have settled all the essential elements of the agreement or agreed upon a method of settlement. *See Greater Serv. Homebuilders' Inv. Ass'n v. Albright*, 293 P. 345, 348 (Colo. 1930). For the Court to enforce Section 2.4 as Vestal requests, the Court would effectively need to write a new section of the contract spelling out the rights of each party and the available remedies in the event that the parties fail to "mutually agree" on patentability. The Court cannot do this, as "the court cannot force parties to come to an agreement." *See DiFrancesco*, 39 P.3d at 1248; *see also Griffin*, 699 P.2d at 409 (an agreement that parents jointly select their child's school is unenforceable if the agreement "neither select[s] a school nor provide[s] a means of resolving deadlocks over school selection").

Vestal argues that Section 2.4 is enforceable as a contract to negotiate the terms of an agreement, relying on *Union Rural Elec. Ass'n, Inc. v. Public Utils. Comm'n*, 661 P.2d 247 (Colo. 1983). *See* Docket No. 33 at 9. However, *Union Rural* is distinguishable. The contract in that case, an agreement between two electric utility companies governing the allocation of customers to either company, included an agreement that "in the event future conflicts arise . . . [the parties] will meet and negotiate in a bona fide manner toward the end of mutually resolving and agreeing upon a solution . . . which will best serve the public interest." *Union Rural*, 661 P.2d at 253. The Colorado Supreme Court did not explicitly determine that this provision was enforceable, holding instead that the dispute between the parties was expressly covered by other terms of the agreement. *Id*. The Court summarized the provision as the parties "agree[ing] to negotiate in good faith over . . . unanticipated problems." *Id*.

The Court is not persuaded that an agreement between two private parties (Vestal and Tegu) is analogous to an agreement between two public utilities supervised by the Public Utilities Commission. *See id*. Even if it were analogous, Section 2.4's lack of any "means of resolving deadlocks" renders the provision unenforceable. *See Griffin*, 699 P.2d at 409. Unlike the *Union Rural* contract, where the parties "agree[d] to negotiate in good faith" with a mutual remedy of filing a complaint with the Public Utilities Commission, Section 2.4 states only that any future agreement shall be "fair and agreeable." *Compare Union Rural*, 661 P.2d at 253, *with* Docket No. 23-2 at 4. Section 2.4 offers no guidance to the Court as to the obligations of either Vestal or Tegu in their future negotiations. Consequently, the Court determines that Section 2.4 is unenforceable.[2]

Having determined that Section 2.4 is unenforceable, the Court now considers what effect its unenforceability has on the agreement as a whole. "In determining whether a contract is severable, the primary objective is to ascertain the intent of the contracting parties." *CapitalValue Advisors, LLC v. K2D, Inc.*, 321 P.3d 602, 606 (Colo. App. 2013) (internal alterations and quotations omitted). Here, the contract contains a severability clause – Section 6.2 of the contract provides that, if any provision of the

---

[2] Vestal argues that the agreement reflects certain goals of both Tegu and Vestal at the time the contract was negotiated. *See* Docket No. 33 at 8-9 (suggesting that "the parties wanted to ensure Vestal would have an incentive to innovate"). However, in interpreting a contract, extrinsic evidence of intent is only relevant if the terms are ambiguous. *Radiology Prof. Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748, 750 (Colo. 1978). Neither Tegu nor Vestal claims that the language of the text is ambiguous, and the Court does not find the agreement ambiguous. *See Union Rural*, 661 P.2d at 251 ("[A] mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law.").

contract is deemed unenforceable and no modification will render it enforceable, the contract "will be construed as if not containing such provision." Docket No. 23-2 at 8. Thus, applying the plain language of the contract, Section 2.4 effectively drops out of the agreement and Section 2.1 controls the parties' ownership interests. Vestal argues that, if Section 2.4 is unenforceable, Section 2.1 is also unenforceable because it is "wholly reliant" on Section 2.4. *See* Docket No. 33 at 9-10. However, the severability clause does not indicate that provisions that are "wholly reliant" fail alongside unenforceable provisions. *See* Docket No. 23-2 at 8. Thus, the severability clause expresses a contrary intent of the parties.

The severability clause directs the Court to construe the agreement as if Section 2.4, which is unenforceable, does not exist. If Section 2.4 does not exist, there are no exceptions to Section 2.1's provision that Tegu owns everything "invented or authored" by Vestal in connection to the agreement. Accordingly, the Court will construe the agreement as indicating that Vestal has no rights to anything "invented or authored" in connection to the agreement.

### 2. Effect on Vestal's Counterclaims

Having interpreted the contract, the Court turns to the question of whether Vestal states any claims for which relief can be granted.

#### a. Contract-Based Claims

Under Colorado law, a breach of contract claim has four elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting

12

damages to the plaintiff." *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).

Vestal claims that, under the contract,

> the parties were required to "mutually agree" on the patentability of Vestal's contributions. Tegu was required to grant Vestal at least a 50% interest in any patent derived from such contributions. Tegu was also required to negotiate in good faith with Vestal and share with Vestal a portion of the revenue generated from Vestal's patentable inventions and non-patentable intellectual property.

Docket No. 26 at 20, ¶ 47. Vestal claims that Tegu failed to perform the contract by

> concealing its intent to apply for patents encompassing Vestal's contributions; failing to negotiate in good faith with Vestal when Tegu contemplated commercializing the product and/or applying for patent(s); affirmatively misrepresenting the scope of the patents it was seeking; filing patent applications covertly and without first discussing the patentability of Vestal's contributions with Vestal; failing to grant 50% ownership, or any percentage, of the patents to Vestal; and failing to share revenue from Vestal's patentable contributions with Vestal.

*Id*. at 21, ¶ 50. Vestal further claims that Tegu failed to perform the contract by "failing to negotiate in good faith and compensate Vestal for its non-patentable contributions." *Id*., ¶ 51. The only source of the duties identified by Vestal that Tegu allegedly failed to perform is Section 2.4 of the agreement. *See* Docket No. 26 at 12-13, ¶¶ 9-11. However, because the Court has held that Section 2.4 of the agreement is unenforceable, Vestal's counterclaim for breach of contract fails, as Vestal has not alleged the existence of a contract. Vestal's claim for breach of the covenant of good faith and fair dealing also fails, as this claim is also based on Tegu's alleged duties under Section 2.4. *See* Docket No. 26 at 22-23, ¶¶ 55-60.

13

### b. Fraud

Under Colorado law, the prima facie elements of a fraud claim are "(1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) representation made with intention that it be acted upon; (5) representation resulting in damage." *Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo. 1987). Vestal asserts that Tegu made two fraudulent representations: Haughey's email statement that it would not file for any utility patents related to Vestal's work and Haughey's statement in a telephone call that he would name Lin and Ko as co-inventors on any patent relating to Vestal's work. Docket No. 26 at 24-25, ¶ 68. The complaint alleges that Vestal, to its detriment, relied on these representations by not "pursu[ing] ownership, co-inventor status, or revenue from commercialization, as Vestal was entitled to do." *Id.* at 25, ¶ 70. This claim, however, rests on Vestal's argument that Section 2.4 entitles it to some ownership rights in its work for Tegu. Because Section 2.4 is unenforceable, Tegu owned everything created by Vestal under the agreement, and Vestal had no entitlement to pursue any ownership rights in its work for Tegu. *See* Docket No. 23-2. As a result, Vestal has failed to allege that Tegu's representations caused it any damage, and its fraud claim must fail.[3]

### c. Quantum Meruit

"Quantum meruit is an equitable theory of recovery that arises out of the need to

---

[3] Tegu argues that the economic loss doctrine bars Vestal's fraud claim. Docket No. 23 at 11-12. As Vestal fails to state a prima facie claim for relief, the Court does not address this argument.

avoid unjust enrichment to a party in the absence of an actual agreement to pay for services rendered." *Melat, Pressman & Higbie, LLP v. Hannon Law Firm, LLC*, 287 P.3d 842, 847 (Colo. 2012). "To recover in quantum meruit, a plaintiff must demonstrate that (1) at plaintiff's expense, (2) defendant received a benefit, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Id*. "Quantum meruit allows a party to recover the reasonable value of the services provided when the parties either have no express contract or have abrogated it." *Id*. "[C]ourts will refuse quantum meruit recovery when expressly contrary to the provisions of the written contract between the parties." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).

Vestal claims that it "conferred a sizable benefit on Tegu," which Tegu accepted, and that it would be "inequitable for Tegu to retain the benefit of Vestal's services without payment of their reasonable value." Docket No. 26 at 23-24, ¶¶ 62, 66. The "benefit" in question is Vestal's "research, design, and prototyping," including both patentable and non-patentable contributions. *Id*. at 23, ¶¶ 62-63. However, an express contract exists that allows Vestal to recover the reasonable value of the services provided. Under the terms of the agreement, Tegu paid $7,200 for ninety hours of work by Vestal, as well as ownership of "any work product or new invention . . . including all intellectual property rights created" as a result of Vestal's work. *See* Docket No. 23-2 at 3-4. Any quantum meruit recovery by Vestal would be "expressly contrary to the provisions of the written contract." *See Dudding*, 11 P.3d at 445. Accordingly, the Court will dismiss Vestal's quantum meruit claim for failure to state a claim.

### d. Correction of Inventorship

Tegu moves to dismiss Vestal's claims for correction of inventorship pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that Vestal lacks Article III standing to bring its claims. Docket No. 23 at 13-15. Tegu claims that Vestal cannot establish that it has suffered an "injury in fact." Docket No. 23 at 13.

Article III of the Constitution vests the judicial branch with jurisdiction to hear "[c]ases" and "[c]ontroversies." U.S. Const. art. III § 2. An essential part of the case-and-controversy requirement is the standing doctrine, which "serves to identify those disputes that are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). To have standing,

> [f]irst, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations, quotations, and alterations omitted). In the context of a correction of inventorship case, a party needs to assert a "concrete financial interest" in the patents at issue in order to have Article III standing. *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1359 (Fed. Cir. 2001).

*Larson v. Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009), controls this case. In *Larson*, the Federal Circuit concluded that plaintiff did not have standing because he had "affirmatively transferred title to the patents . . . and he stands to reap no benefit"

16

from his correction of inventorship claim. *Larson*, 569 F.3d at 1326. The plaintiff's ownership interest was contingent on state-law claims which requested recission of the patent assignments to a third party. *Id*. at 1326-27. Vestal here claims that Lin and Ko should be named inventors on the three patents. See Docket No. 26 at 17-20, ¶¶ 28-45. Vestal also asserts that both Lin and Ko are "obligated to assign their patent rights to Vestal." *Id*. at 17, ¶ 25. However, Section 2.1 of the agreement states that Vestal assigned all of its right, title, and ownership in "all intellectual property rights created, invented, or authored by [Vestal] in connection with" its work for Tegu to Tegu. *See* Docket No. 23-2 at 4. Therefore, like in *Larson*, Vestal's only ownership interest is contingent on Section 2.4 of the agreement, which the Court has determined is unenforceable. Accordingly, Vestal does not have standing to bring its claims for correction of inventorship.[4] As a result, the Court will dismiss the correction of inventorship claims for lack of jurisdiction.[5]

### B. Tegu's Request for Declaratory Judgment

Tegu requests that the Court grant judgment on the pleadings on its sole claim for relief. Docket No. 23 at 7-9. Tegu seeks a declaratory judgment that Colo. Rev. Stat. § 13-80-101(1)(a), which provides that the statute of limitations for a breach of

---

[4] Vestal's reliance on *Chou* is misplaced. In that case the Federal Circuit concluded that plaintiff had standing because she "alleged a concrete financial interest in the patent." *Chou*, 254 F.3d at 1359. Here, Vestal has failed to allege a concrete financial interest in the patents, because the agreement between Tegu and Vestal assigns all financial interest that Vestal might have in the patents to Tegu.

[5] Vestal moves to strike the Declaration of Christopher Haughey [Docket No. 23-5], which Tegu submitted in support of its motion. Docket No. 32. As the Court does not rely on the declaration in ruling on Tegu's motion, the Court will deny Vestal's motion as moot.

contract action is three years, "bars Vestal's claims under the [a]greement." Docket No. 1-2 at 11, ¶ 41. The Court's interpretation of the agreement renders the statute of limitations issue moot because Vestal's rights under Section 2.4 have been decided.[6] Tegu admits that "Vestal's only avenue to argue that it is entitled to more money or to intellectual property rights is under Section 2.4." See Docket No. 23 at 10. Further, the Court's order resolves all of Vestal's potential claims that Tegu hopes to bar through a declaratory judgment. See Docket No. 1-2 at 11, ¶ 41 (listing four potential claims by Vestal); see also Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1382 (10th Cir. 2011) ("Absent [an] identifiable claim against [a party], there [is] no actual controversy to be resolved in the declaratory-judgment action."). Tegu has not shown that, with Vestal's rights under Section 2.4 decided, there is a controversy between the parties of "sufficient immediacy and reality" that would give the Court jurisdiction to issue a declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). The Court will therefore deny Tegu's request for a declaratory judgment on the applicability of Colo. Rev. Stat. § 13-80-101(1)(a) as moot.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Tegu's Rule 12(c) and 12(b)(1) Motion for Judgment on the Pleadings and to Dismiss Vestal's Counterclaims [Docket No. 23] is **GRANTED IN PART** and **DENIED IN PART**. It is further

---

[6] "[F]ederal law determines whether a district court may properly enter a declaratory judgment in a given case." Addison Ins. Co. v. Maynard, No. 08-cv-00054-WDM-BNB, 2008 WL 2079143, at *2 (D. Colo. May 15, 2008); see also Farmers Alliance Mut. Ins. Co. v. Jones, 570 F.2d 1384 (10th Cir. 1978).

**ORDERED** that Vestal's First through Sixth Causes of Action are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction. It is further

**ORDERED** that Vestal's Seventh through Tenth Causes of Action are **DISMISSED WITH PREJUDICE**. It is further

**ORDERED** that Tegu's Claim for Declaratory Judgment is **DENIED AS MOOT**.

**ORDERED** that Vestal Design Atelier LLC's Motion to Strike the Declaration of Christopher Haughey (Dkt. # 23) [Docket No. 32] is **DENIED AS MOOT**. It is further

**ORDERED** that, within 14 days of the entry of judgment, plaintiff may have its costs by filing a bill of costs with the Clerk of the Court. It is further

**ORDERED** that this case is closed.

DATED August 12, 2019.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge